IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
UNITED STATES,                )
                              )
     v.                       )
                              )
ROBERT C. FENN,               )   1:12cr510 (JCC)
                              )
                              )
     Defendant.               )
```

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Robert Fenn's ("Defendant") Motion to Suppress Statements ("Motion"). [Dkt. 14.] For the following reasons, the Court will deny Defendant's Motion.

### I.  Background

A.  Factual Background

Around March 19, 2010, the Child Exploitation Section of the ICE Cyber Crimes Center ("ICE/C3/CES") received information from the National Centre for Combating Pedophilia Online ("Centro Nazionale per il Contrasto alla Pedopornografia On-line" or "CNCPO") regarding a website called "liberalmorality.com" which allegedly provided access to child pornography.  (Gov't Opp. [Dkt. 15] at 3; Ex. C.1 to Gov't Opp.,

1

ICE Report of Investigation at 1.)[1]  Using the website's corresponding URL (www.liberalmorality.com) provided by CNCPO, an ICE agent at ICE/C3/CES accessed the website and determined that many of the pages contained child pornography.  (Gov't Opp. at 3; ICE Report at 1, 3.)

Around April 20, 2010, an ICE agent obtained and executed a federal search warrant for the website, resulting in evidence including web access logs which had tracked activity on the website and recorded all requests processed by the server containing the website.  (Gov't Opp. at 3.)  These web access logs indicated when a user accessed the website, as well as the specific files which the user accessed, received, or attempted to receive.  The web access logs for the IP address 72.196.254.100 at the relevant time demonstrated that the user had accessed the website and obtained child pornography.  (Gov't Opp. at 3-4; ICE Report at 3.)  Accordingly, around August 6, 2010, ICE/C3/CES issued an administrative subpoena to Cox Communications, Inc. for the information for the IP address 72.196.254.100 from the date and time contained in the web access logs for liberalmorality.com.  In response, on or around January 14, 2011, Cox Communications indicated that at the relevant time, this IP address was registered to Bill Fenn and

---

[1] All of the facts in this statement of facts also are supported by the testimony of the Government's witnesses at the evidentiary hearing on January 18, 2013:  Special Agent Tarrah Green and Detective John Spata.  The Court found the testimony provided by the Government's witnesses credible.

service of this IP address was being provided at a home address in Herndon, Virginia. (Gov't Opp. at 4; ICE Report at 3.) A check with the Division of Motor Vehicles and the United States Postal Service confirmed that an individual named William Frank Fenn resided at the Herndon, Virginia address, along with three additional individuals named Catherine Fenn, Robert Fenn, and John Fenn. (Gov't Opp. at 4.)

Based on this investigation, the government obtained a search warrant in Fairfax County Circuit Court for violations of Virginia Code 18:2-374.1: Possession, reproduction, distribution, and facilitation of Child Pornography. (*Id.*) On June 12, 2012, law enforcement agents from the Fairfax County Police Department and ICE executed the search warrant at William Fenn's residence in Herndon, Virginia, entering the house at approximately 8:00 am where all members of the household were present. (*Id.*; ICE Report at 3.) Consistent with standard protocol for safety precaution, the initial entry agents had their weapons drawn. The agents who ultimately interviewed Defendant, Special Agent Tarrah Green and Detective John Spata, were not a part of the initial entry team and did not have their weapons drawn at any point during the search or interviews. (Gov't Opp. at 4-5.) The agents did not handcuff the members of the Fenn family at any time and instead informed all of them, including Defendant, that no one was under arrest and that they

3

all were free to leave. (*Id.* at 5.) The agents asked each member of the household if they would agree to speak with law enforcement and each person agreed. (*Id.*)

At approximately 8:15 am, Green asked Defendant if the agents could speak with him. (*Id.*) Prior to this first interview, Defendant indicated that he need to call his work and did so, informing the school (his employer) that he was "going to be late" due to "personal things" but that they did not need to get a substitute teacher. (Ex. A.1 to Gov't Opp., First Interview Tr. [Dkt. 15-2] 2:1-5, 19-25; Gov't Opp. at 5; ICE Report at 3.) The agents also brought Defendant upstairs to his room to put on his shoes in order to finish getting dressed for work and then went with Defendant to another furnished bedroom/office. (First Interview Tr. 2:6-13, 3:8-12; Gov't Opp. at 5; ICE Report at 3-4.) Finally, before beginning the interview, the agents explained that they were just "try[ing] to explain stuff to people individually" because "[p]eople have different questions, different concerns," asked Defendant if he needed anything before they got started, to which Defendant replied "No," and checked that Defendant had made the call to his work, which Defendant affirmed that he already had done. (First Interview Tr. 3:15-17, 20-25.) The agents asked Defendant if he would like to sit down but he stated that he preferred to stand and thus he and the agents remained standing

4

during the interview. (ICE Report at 4.) The agents also informed Defendant that they were shutting the door to the bedroom solely for privacy, but affirmed several times that it was unlocked. (First Interview Tr. 4:4-6.) Finally, the agents clarified twice that, as they had already mentioned to the family downstairs, "no one's under arrest," and they told Defendant that "[i]f you feel you want to leave, you can, but we give the opportunity to talk . . . to everyone . . . ." (*Id.* 4:21-25.) Defendant replied "Okay" to this information, and then the agents began the interview. (*Id.* 5:1.) During the interview, Defendant denied ever viewing any child pornography. (*Id.* 16:3-5, 9-11, 18:12-14.) The interview lasted approximately 30 minutes and after it concluded, Defendant left the house and went to work. (Gov't Opp. at 5; ICE Report at 10.)

Following Defendant's departure from his home, and during the execution of the search warrant, a forensic preview of electronic equipment revealed that a computer found in Defendant's bedroom contained several child pornographic videos. (ICE Report at 10.) As a result, law enforcement determined Defendant had not been truthful in his first interview and a second interview was necessary. (Gov't Opp. at 5.)

Accordingly, at 12:30 pm that same day, Special Agent Green and Detective Spata interviewed Defendant in a vehicle

5

parked in the staff parking lot outside of his place of work. (ICE Report at 10; Second Interview Tr. in ICE Report at 11-12.) Upon entering the Jeep, the agents explained to Defendant that they wanted to talk to him again because he had told them in the first interview that there was nothing of concern on his computer but that the forensic preview had located child pornography files. (*Id.* at 11-13.) The agents then asked Defendant if he would be willing to talk to them further and he stated "I don't have a problem with that." (*Id.* at 13.) Immediately thereafter, the agents informed Defendant of his *Miranda* rights by providing him with a written statement of rights and waiver of those rights, allowed Defendant to review the document, and asked Defendant whether he had any questions about his rights and the waiver prior to signing the document, to which he stated "No." Defendant then signed the waiver. (*Id.* at 13-16; Ex. B to Gov't Opp., Signed Statement of Rights and Waiver.) After this, the agents asked if they could begin the second interview about Defendant and his computers and Defendant stated "Sure, absolutely." (Second Interview Tr. in ICE Report at 16.) The second interview lasted approximately 30 minutes. (Gov't Opp. at 5-6.)

B. Procedural Background

On December 14, 2012, at Defendant's arraignment, this Court set a January 3, 2013 deadline for motions prior to trial.

6

[Dkt. 12.] Defendant filed his Motion to Suppress Statements late on January 7, 2013. [Dkt. 14.] In his motion, Defendant seeks to suppress the two recorded statements which he gave on June 12, 2012. The Government filed its opposition on January 16, 2013. [Dkt. 15.] An evidentiary hearing was held on Defendant's Motion on January 18, 2013, before this Court.

Defendant's Motion is now before the Court.

## II.  Analysis

Defendant argues that during his first interview, he was in custody but was not given his *Miranda* warnings, and his statements from the first interview therefore should be suppressed. Defendant also argues that his statements from the second interview should be suppressed because the agents allegedly employed an improper statement-warnings-statement technique by deliberately obtaining the unwarned statements from the first interview and then warning Defendant prior to eliciting his statements from the second interview. The Court rejects both of these arguments.

"A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by Miranda." *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (citations omitted). Any statements a suspect makes during custodial interrogation are inadmissible unless the defendant received *Miranda* warnings. *Id.; see also Berkemer v. McCarty*,

7

468 U.S. 420, 434 (1984). For *Miranda* purposes, a person is "in custody" when he is formally arrested or questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." *Leshuk*, 65 F.3d at 1108 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, *Stansbury*, 511 U.S. at 322, and determine whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Interrogation, in turn, refers not only to express questioning, but also to any "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

First, the Court finds that Defendant was not in custody during the first interview and accordingly, *Miranda* warnings were not necessary and his statements from that interview are admissible. The facts in this case are directly on point with the circumstances in *United States v. Hargrove*, under which the Fourth Circuit found a defendant was not in custody. 625 F.3d 170 (4th Cir. 2010). Significantly, as in

*Hargrove*, prior to beginning the first interview the agents told Defendant both that he was not under arrest *and* that he was free to leave. (First Interview Tr. 4:21-25.) Although these statements admittedly are not "talismanic" in and of themselves, the Fourth Circuit has held that they are factors which "mitigate[] an interview's custodial nature" and are "highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody.'" *Hargrove*, 625 F.3d at 180. The combination of such statements particularly is effective. *Id.*

In addition, the context in which the first interview took place and manner in which it was conducted supports the finding that the interview was non-custodial. The agents conducted the interview in Defendant's home in a fully furnished bedroom. (First Interview Tr. 2:6-13, 3:8-12; Gov't Opp. at 5; ICE Report at 3-4.) The evidence indicates that the interviewing agents accommodated Defendant's requests, did not restrain him at any point, and conducted the interview in a friendly and non-threatening manner. The agents allowed him to finish getting dressed for work and to contact his employer prior to the interview. They checked to make sure he did not need anything else before starting the interview and specifically confirmed that he successfully had contacted his employer per his request. They acquiesced to his preference

9

that they stand during the interview and, as testified to by the agents and admitted to by Defendant at the hearing, Defendant stood closest to the door during the interview.  Finally, the agents explicitly noted to Defendant that the door was closed solely for privacy and was not locked.  (First Interview Tr. 2:1-5, 19-25, 3:15-17, 20-25, 4:4-6; Gov't Opp. at 5; ICE Report at 3-4.)  *See Hargrove*, 625 F.3d at 180-81 (noting the relevance of (a) a defendant being "on his own turf" and that "an interview at a suspect's resident tends to be more neutral than one that occurs at a law enforcement facility" and "suggests a setting that is not of the degree typically associated with a formal arrest," (b) limited restraints on defendant's movement and lack of handcuffs, and (c) the conversation being "amicable and non-threatening in tone").

      Moreover, although the initial entry team displayed their weapons while entering the premises, the agents conducting the interview were not a part of that team and did not display any weapons during the entire encounter.  (Gov't Opp. at 4-5.)  Given that the interviewing agents' "firearms were not drawn during the interview and they did not threaten" Defendant, the initial entry team's use of drawn guns to conduct a proper safety sweep and subsequent "mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation."  *Hargrove*, 625 F.3d at 179.

As a result, the Court concludes that as in *Hargrove*, under the totality of the circumstances Defendant was not subject to custodial interrogation at the time of the first interview. Defendant's statements from that interview therefore are admissible.

Second, the Court also concludes that Defendant's statements from the second interview are admissible. To begin, the statement-warnings-statement technique discredited in *Missouri v. Seibert*, 542 U.S. 600 (2004), does not apply to the instant case. "*Seibert* involved withholding Miranda warnings until after a custodial interrogation and drawing out a confession, then giving the warnings, and then repeating the question until the already-provided confession was repeated." *U.S. v. Kim*, 2012 WL 6561758 (E.D. Va. Nov. 20, 2012). However, as this Court has found that the first interview was not custodial, Defendant cannot invalidate the second interview by claiming it was part of such an improper scheme.

Furthermore, in his controlling concurrence to the plurality decision in *Seibert*, Justice Kennedy noted that curative measures such as "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." 542 U.S. at 622. Such a

substantial break in time and circumstances occurred in this case.  Almost four hours after the first interview had concluded and Defendant had left the location of that interview (his house), and after the forensic preview indicated that there was child pornography on Defendant's computer contrary to his statements in the first interview, the agents initiated contact with Defendant for the second time.  At that point, the agents went to a parking lot outside of Defendant's workplace, provided Defendant with *Miranda* warnings, and then conducted the second interview.  (ICE Report at 10; Second Interview Tr. in ICE Report at 11-16; Signed Statement of Rights and Waiver.)  These facts, in conjunction with testimony at the hearing by the agents which this Court found credible, indicate that the agents did not employ any improper deliberate "questions-first" strategy in obtaining the second set of statements.  The admissibility of these statements therefore is governed by the analysis in *Oregon v. Elstad*, 470 U.S. 298 (1985).  *Seibert*, 542 U.S. at 620; *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005).

In *Elstad*, the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" to any later post-warning statement.  470 U.S. at 314.  Rather,

"[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318. As discussed above, the facts here indicate that Defendant was not in custody during the first interview and made the corresponding first set of statements voluntarily. In addition, in his Motion, Defendant does not claim that his statements in the second interview were not made voluntarily. Moreover, the facts presented support a finding that Defendant made the statements in his second interview voluntarily. Prior to starting that interview, Defendant reviewed a statement of his *Miranda* rights and a waiver of them, had an opportunity to ask questions about that document to the agents during which he affirmed that he had no questions, signed the waiver, and then confirmed that he "absolutely" was fine with conducting a second interview. (Second Interview Tr. in ICE Report at 13-16; Signed Statement of Rights and Waiver.) The Court also notes that at the time of the interviews, Defendant had attended George Mason for his undergraduate degree, was attending that university for his master's degree in education, and held full-time employment as a teacher, education achievement and employment stability which further support a finding of voluntariness. (First Interview Tr. 6:14-9:9.) Finally, a review of the entire transcript of that interview supports the conclusion that his statements were voluntary because his will was neither overborne nor his

capacity for self-determination critically impaired. (*See* Second Interview Tr. in ICE Report.) *See also United States v. Pelton*, 835 F.3d 1067, 1071-72 (4th Cir. 1987).

Given that the Court finds that the fist interview was not custodial, that the agents did not engage in an improper "questions-first" scheme through the first and second interviews, and that Defendant's statements in the second interview were made voluntarily, the Court concludes that the statements in that latter interview are admissible.

### III. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion to Suppress Statements.

                                                _/s/_____ _____
January 22, 2013                         James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE